Duane Dean THORNTON, Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE; Bureau of Prisons; John Does; County of Anoka; Sandra Strom; and Marilyn Noll, Defendants.

No. Civ. 98–456(JRT/JMM).

United States District Court, D. Minnesota.

April 25, 2000.

Stephen W. Hance, Martin & Squires, St. Paul, MN, for plaintiff.

Mary Jo Madison, Assistant United States Attorney, Office of the United States Attorney, Minneapolis, MN, Joseph R. Lipton, U.S. Department of Justice, Torts Branch Civil Division, Washington, DC, for federal defendants.

Robert D. Goodell, Assistant Anoka County Attorney, Office of the County Attorney, Anoka, MN, for Anoka County defendants.

## MEMORANDUM OPINION

TUNHEIM, District Judge.

Plaintiff Duane Dean Thornton brings this action against the United States Marshals Service, the United States Bureau of Prisons, and three unidentified United States Marshals (the "federal defendants"), Anoka County, Deputy Detention Officer Sandra Strom ("Strom"), Marilyn Noll ("Noll"), and two unidentified deputy officers at the Anoka County Jail (the "Anoka County defendants").[1] Plaintiff seeks physical, emotional and economic damages arising from injuries he sustained while a federal prisoner incarcerated at the Anoka County Jail. Plaintiff charges the federal defendants with negligence under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, and charges the Anoka County defendants with negligence under section 466.02 of the Minnesota Statutes. Plaintiff further charges Noll with medical malpractice, and brings claims against the federal and Anoka County defendants under the Cruel and Unusual Punishment and Due Process Clauses of the United States and Minnesota Constitutions. This matter is before the Court on a motion for summary judgment brought by the Anoka County defendants against all claims, and on Anoka County's motion to dismiss the unidenti-

---

1. Plaintiff also filed claims against Dr. Bryant Beehler. Pursuant to the parties' stipulation, the Court dismissed these claims with prejudice on October 13, 1999.

fied "John Doe" deputy officers at the Anoka County Jail. Plaintiff's claims against the federal defendants are not at issue in this motion.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* Summary judgment is mandated when, after adequate time for discovery and upon motion, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *See Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir.1980). The nonmoving party may not merely rest upon allegations or denials in its pleadings, however, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *See Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir.1981). Importantly, a court need not grant summary judgment if the evidence submitted by the non-moving party to support an allegation of material fact is merely colorable or is not significantly probative. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

In setting forth the facts underlying plaintiff's claims, the Court has endeavored to carefully review the record rather than accepting the assertions articulated in the parties' memoranda, without more, to be true. The Court has drawn all inferences supported by the record in plaintiff's favor, but has not adopted those inferences that are without sufficient support to permit a reasonable juror to so find.

## BACKGROUND

At approximately 2:00 p.m. on January 25, 1996, plaintiff turned himself in to the United States Marshals Service on federal bank robbery charges. Prior to doing so, plaintiff spent more than twenty-three hours walking around outside in the frigid Minnesota temperatures agonizing over his decision. As a result, his feet were severely frostbitten at the time that he turned himself in.

According to plaintiff, the Marshals failed to fill out a medical screening form or to ask him about his medical condition during the intake interview. He states that although he complained that his feet were numb and asked to see a nurse or a doctor, he received no medical attention and that instead the Marshals placed him in a holding cell. Plaintiff further alleges that approximately two and one-half hours later the Marshals returned to his cell in order to transport him to the Anoka County Jail. Plaintiff alleges that at that time he again asked to see a nurse or a doctor regarding his feet, but that the Marshals told him he would have an opportunity to see a doctor later.

Defendant Strom performed plaintiff's intake interview upon his arrival at the Anoka County Jail at approximately 5:00 p.m. As a part of the admissions process, she asked him whether he had been injured at any time during the previous twenty-four hours. He said, "Yes," and

Strom wrote, "Frozen Feet/Cannot feel 7 out of 10 toes," on plaintiff's intake form. Strom asked him how this problem occurred and he told her that he had been walking around outside for many hours. Plaintiff did not volunteer any additional information about his feet and, according to plaintiff, Strom did not question him further. Plaintiff testified, however, that he specifically asked Strom to see a nurse or a doctor. After finishing the interview, Strom placed plaintiff in a holding cell but apparently did not notify either her supervisor or a medical professional immediately about the problem with plaintiff's feet. Instead, she placed the intake form in an intake box where a nurse would be likely to retrieve it the next morning.

About half an hour after plaintiff arrived at the holding cell a guard served him with dinner. Plaintiff alleges that he asked the guard to see a nurse or a doctor, and that the guard was not responsive to his request. He further alleges that he repeated his request later when the guard returned to pick up the food trays, and that the guard again failed to obtain assistance.

Later that evening another guard removed plaintiff from the holding cell and brought him to an area where he was required to change his clothes. While he did so a deputy at the jail observed the condition of his feet, which were swollen and purple in color. The deputy expressed shock at what he saw and immediately contacted Strom, who came to plaintiff's cell to investigate. When Strom observed the condition of plaintiff's feet she immediately contacted Noll, who was the nurse on duty at the time. Plaintiff admits that Noll came to look at his feet within the next two minutes, although the record is unclear as to precisely when Strom contacted her. Plaintiff suggests that Strom failed to contact Noll until ap-

proximately one hour after she placed him in the holding cell, and approximately two hours after his arrival at the jail. Defendants contend that Noll arrived before 6:00 p.m., approximately one hour after plaintiff's arrival at the jail. For purposes of this motion, the Court construes the facts in the light most favorable to plaintiff and assumes that plaintiff received no medical attention until approximately two hours after his arrival at the jail.

Upon examining plaintiff's feet, Noll diagnosed that they probably were frostbitten and had some vascular damage. She gave plaintiff a pair of oversized shoes to make his feet more comfortable, told him to stay off of his feet, and thereafter telephoned Dr. Bryant Beehler ("Beehler") for advice regarding what method of treatment would be appropriate.[2] According to Beehler, he spoke with Noll regarding plaintiff's condition for fifteen minutes. He states that she told him plaintiff's feet had been re-warming for approximately five hours and that he had been walking on them during the re-warming period. Based on that information, Beehler testified that he believed there was little that could be done to prevent further damage other than to protect plaintiff's feet and to prescribe antibiotics. Noll denied that she and Beehler discussed the possibility of emergency room treatment, but Beehler testified to the contrary. According to Beehler, he told her that she should make the decision regarding whether to admit plaintiff to an emergency room since she was in the best position to evaluate him. Beehler further states that he told Noll that, in any event, it was imperative for a physician to examine plaintiff sometime the next morning. The Court accepts Beehler's testimony as true since it best supports plaintiff's position.

What Noll did next is a matter of significant controversy between the parties. De-

---

**2.** Beehler's relationship with Anoka County was in the nature of an independent contractor who provided medical services to inmates at the jail. He was not employed by Anoka

County and at the time of Noll's call was not present at the jail to provide medical care. Rather, he was simply available to provide advice to Noll over the telephone.

fendants contend that Noll telephoned a pharmacy, obtained the medications that Beehler recommended, and administered them to plaintiff before 7:30 p.m. on the date of his admission, January 25. Plaintiff asserts that Noll simply went home, and that as a result he did not receive any medication until January 26.

Upon examining the record, the Court finds that plaintiff has failed to present sufficient evidence on this issue to create a genuine factual dispute. Plaintiff alleges that during his deposition he denied receiving any medication until January 26. A review of his entire deposition testimony, however, reveals that he simply did not remember whether Noll gave him medication on the day of his admission, and admitted that she may have done so.[3]

Plaintiff further notes that, although the jail's medication administration form documents that he received medication on January 25, he did not initial the form on that date. Nevertheless, Noll has offered uncontroverted testimony indicating that according to jail policy a patient's initials were only requested when a deputy or other employee who was not a medical professional administered the medication. Consistent with this position, Noll also failed to obtain plaintiff's initials on January 26 and 27—days on which he does not dispute receiving medication. Thus, plaintiff's failure to initial the medication administration form on January 25 does not support an inference that Noll failed to administer it to him on that date.

Next, plaintiff asserts that according to Noll's own testimony she was unsure about whether she gave plaintiff medication on January 25. Nevertheless, a review of the cited testimony shows this assertion to be false. Noll testified unequivocally that she administered medication to plaintiff on January 25.[4]

Plaintiff further asserts that he did not receive medication on January 25 because the date on the voice order form that Noll filled out when she called the pharmacy appears to have been altered, and because Beehler testified that he did not recall whether the pharmacy telephoned him on January 25 to confirm the prescription that Noll ordered. Although the Court accepts these assertions as true, an inference that Noll failed to administer him medication on the date of his admission does not permissibly arise therefrom. Official records from the pharmacy itself plainly show that two medications, heparin sodium and cephalexin, were ordered for plaintiff and approved by Dr. Beehler on January 25. Plaintiff suggests no motive on the part of the pharmacy to submit inaccurate records, and offers no evidence calling their authenticity into doubt. Moreover, Noll filled out a medication administration form showing that she administered these medications to plaintiff on January 25. The date and other information contained on this form do not appear to have been altered in any way. Furthermore, the doctor who examined plaintiff on January 26 wrote in his medical notes, "Started Rx. 1/25/96," indicating his understanding that plaintiff had received medi-

---

**3.** Plaintiff initially testified that he did not recall receiving medication from Noll on January 25. Nevertheless, he later explained that he simply did not remember, stating, "She might have ended up giving medication, but honestly I don't remember—I don't remember for sure that she gave me some. She might have, but at the time that everything was going on—I mean I don't remember her giving me medication. She might have." (Dep. II of Duane Dean Thornton at 51.)

**4.** Noll testified as follows:

A. . . . after I talked to the doctor I had to write a telephone order for the medication so that's kind of backing up. Then after I got the medications, Heparin is an injectable, I needed to find an insulin syringe, draw up the proper amount of medication, write the med sheet, get an alcohol wipe, go back up the elevator to booking, find the inmate and give the injection.

Q. And this is something that you did all on the 25th of January?

A. Correct.

(Dep. of Marilyn Noll at 31.)

cations on the date of his admission. In light of all of this evidence, along with plaintiff's admission that Noll "might have" given him medication on January 25, no reasonable jury could conclude that she failed to do so. The evidence simply does not support the contrary inference that plaintiff now advocates. Although the Court must give plaintiff the benefit of all inferences that might reasonably be drawn from the evidence, it need not give plaintiff the benefit of inferences that are supported only by merely colorable or non-probative evidence. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The present record shows that Noll treated plaintiff with heparin sodium and cephalexin on the night of his admission to the jail.

After giving plaintiff the medications, Noll apparently went home for the evening without sending plaintiff to a hospital emergency room for treatment. The next morning a physician examined plaintiff. In addition to confirming that the prescriptions previously given to plaintiff should be continued, he indicated that plaintiff's feet should be protected, elevated and soaked in warm water, and that the infection should be monitored.

Although staff at the jail continued to provide plaintiff with the medications prescribed, his infection continued to worsen. According to plaintiff, his care during his stay at the jail was inadequate. Plaintiff states that because insufficient staff members were available to help him, he frequently had to soak, debride and bandage his own wounds, request and inject his own I.V. medications, and walk on his injured feet in order to get medical supplies or meals, thus preventing them from being elevated as prescribed. Plaintiff further alleges that sometimes staff members failed to refill his medications soon enough to prevent them from running out, and that for part of his stay at the jail he was placed in a cell that was so cold he could see his breath.

In response to plaintiff's deteriorating medical condition, Anoka County officials transferred him to a hospital on February 10, 1996. On the following day nine of his toes were amputated. He returned to the jail on February 21 and remained there until April 11, 1996, when he was transferred to the federal medical facility in Rochester, Minnesota pending sentencing.

Plaintiff offers expert testimony stating that if he had received emergency medical care at the time of his admission to the jail, some or all of the amputations could have been prevented. According to the expert, such treatment would have included rapid re-warming of his feet rather than the "passive re-warming" at room temperature that occurred. Plaintiff's expert further opined that if plaintiff had been admitted to an emergency room at the time that Noll examined him, a substantial amount of the tissue loss could have been prevented. The expert also stated that plaintiff's allegedly inadequate care while a prisoner at the jail likely increased the extent of his injuries.

## ANALYSIS

### I. Motion to Dismiss Fictitious Defendants

■ Anoka County seeks to dismiss the fictitious deputy officers named in plaintiff's complaint on the ground that he has failed to identify them. In *Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir.1985), the Eighth Circuit held that it was improper for a court to dismiss a fictitious defendant at an early stage in litigation, when it appeared likely that the defendant could be identified later through the process of discovery, court-ordered disclosure, or some other form of court intervention. In so holding, the court indicated that dismissal may be appropriate when these measures do not reveal the identity of an unnamed defendant. *See id.* (citing *Schiff v. Kennedy*, 691 F.2d 196, 198 (4th Cir. 1982)).

The parties have conducted a significant amount of discovery in this matter and no further discovery is permissible under the

Court's Scheduling Order. The deadline for amendments to the complaint has also passed. Nevertheless, plaintiff has neither identified the unnamed Anoka County deputies, nor sought assistance from the Court in doing so. Moreover, plaintiff has not directly opposed Anoka County's motion to dismiss these defendants. The Court accordingly dismisses them without prejudice.

## II. 42 U.S.C. § 1983

■] Plaintiff states claims against Anoka County, Strom, and Noll under 42 U.S.C. § 1983 for violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Challenges to conditions of confinement raised by convicted prisoners arise under the Eighth Amendment's Cruel and Unusual Punishment Clause, while challenges raised by pre-trial detainees arise under the Due Process Clause of the Fourteenth Amendment.[5] *See Whitnack v. Douglas County,* 16 F.3d 954, 957 (8th Cir.1994); *see also Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 905 (8th Cir. 1999).

■ Courts hold that "a prisoner's Eighth Amendment rights are violated when government entities or officials are deliberately indifferent to a prisoner's medical needs or to his or her safety." *Spencer,* 183 F.3d at 905 (internal citations omitted). Eighth Amendment claims have both an "objective" and a "subjective" component, requiring courts to assess objectively whether the deprivation of rights was sufficiently serious, and subjectively whether prison officials acted with a sufficiently culpable state of mind. *See Whitnack,* 16 F.3d at 957. This subjective deliberate indifference test requires plaintiffs to prove that the officials "both knew of

and disregarded an excessive risk to health or safety." *Spencer,* 183 F.3d at 905.

While this standard is routinely applied in Eighth Amendment cases, the Eighth Circuit has not yet articulated the standard that courts should apply to due process claims involving pre-trial detainees. *See id.* at 906. Some cases indicate that pre-trial detainees may be entitled to greater protections than convicted prisoners. *See id.* (citing *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Johnson–El v. Schoemehl,* 878 F.2d 1043, 1055 n. 8 (8th Cir.1989)). In *Spencer,* the Eighth Circuit applied the deliberate indifference test to a pre-trial detainee's due process claim, but suggested that an objective, rather than subjective, deliberate indifference test might be applicable to such claims. *See id.* at 905–06. Under this standard, liability arises if the inadequacy of the government's policies is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can be said to have been deliberately indifferent." *Id.* (citing *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Farmer v. Brennan,* 511 U.S. 825, 840–41, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Although the record is unclear, it appears as though plaintiff plead guilty to the charges against him soon after he turned himself in at the United States Courthouse, and before the surgery on his feet took place.[6] The Court for this reason infers that in the period of time during which the events at issue in this matter occurred plaintiff was initially a pre-trial detainee, and later a convicted prisoner awaiting sentencing. Thus, a portion of plaintiff's claims appears to arise under the Eighth Amendment, and the other por-

---

5. Although plaintiff states his due process claim under the Fifth Amendment only, the Court analyzes it under the Fourteenth Amendment for purposes of this motion because Anoka County is a state, rather than a federal, entity.

6. Plaintiff's complaint states that he turned himself in pursuant to a plea agreement.

tion under the Fourteenth Amendment. As the record does not indicate when plaintiff entered his plea, it is not possible to analyze them separately. Nevertheless this omission does not present a significant obstacle to the determination, of plaintiff's claims, because the Court finds for the reasons set forth below that his claims against Strom and Anoka County should proceed under the subjective test, even though that test is more difficult for a claimant to satisfy. Moreover, the Court finds that plaintiff's claims against Noll should be dismissed even under the less stringent objective test.

## A. Marilyn Noll

■ Plaintiff asserts that Noll treated him with deliberate indifference because she failed to refer him to an emergency room for treatment on the night of his admission, and because she failed to administer the medications that Dr. Beehler prescribed until the following day. Plaintiff further notes that Noll failed to consult a medical manual that she had in her office in order to determine whether emergency treatment was necessary.

For the above reasons, the Court rejects plaintiff's allegation that Noll failed to administer the prescribed medications to him on the night of his admission. This contention is not sufficiently supported by the record to raise a genuine issue of fact.

Moreover, Noll's failure to consult the medical manual on her desk must be evaluated in light of her decision to consult with a physician about his condition instead. While the manual may have provided Noll with generalized information about frostbite, her interactive consultation with Dr. Beehler provided her with much more specific advice about how best to treat plaintiff. Under these circumstances, Noll's decision to investigate plaintiff's treatment options without consulting the manual does not constitute deliberate indifference to his medical needs.

Furthermore, Noll's failure to refer plaintiff to an emergency room must also be evaluated in light of her consultation with Dr. Beehler. Noll is not a medical doctor, and her decision to rely upon the information that Dr. Beehler provided to her was reasonable. During that consultation, Dr. Beehler told her that plaintiff's feet should be protected and that he should receive antibiotics in order to alleviate any infection. Dr. Beehler also told her that it was necessary for a physician to examine plaintiff the next morning. The record reflects that Noll ensured that all of Dr. Beehler's recommendations were met. She provided plaintiff with more comfortable shoes and told him to stay off of his feet. She also obtained the necessary medications from a pharmacy and administered them to plaintiff on the same evening. Finally, Noll ensured that a physician examined plaintiff the next morning.

Although Dr. Beehler testified that he also discussed with Noll the possibility of emergency room treatment, he believed that it was too late to prevent significant damage to plaintiff's feet since they had already undergone passive re-warming for a period of approximately five hours. Thus, he did not advise Noll that such treatment was necessary, but instead told her to make the decision based on her own observations although she had no training as a physician. Noll's decision not to refer plaintiff for emergency treatment constitutes an exercise of medical judgment that, in hindsight, may have been erroneous. Under these circumstances, however, no reasonable inference arises that she knew of a serious medical risk to plaintiff and chose to disregard it. Moreover, plaintiff has failed to demonstrate that his need for emergency hospital care, as opposed to the treatment that Noll administered to him, was so objectively obvious that her actions can be deemed deliberately indifferent.

## B. Sandra Strom

■ Defendants contend that Strom's failure to notify a medical professional immediately about plaintiff's condition did

not constitute deliberate indifference, because there is no evidence from which a jury could infer that Strom knew that immediate medical intervention was necessary. The Court disagrees. Plaintiff informed Strom that he could not feel most of his toes even though he had been indoors in the custody of the Marshals for several hours. Plaintiff also told Strom that he had walked around outside in the frigid January temperatures for many hours before turning himself in at the Courthouse. Moreover, according to plaintiff he specifically asked Strom to see a nurse or a doctor. Under these conditions, the need for an immediate medical examination was obvious. Nevertheless, Strom did nothing to assure that plaintiff received one.

Strom's conduct differs substantially from that of Noll. While Noll responded to plaintiff's medical needs within minutes of learning about them, Strom ignored plaintiff's plea for immediate medical attention and instead placed his intake form in a box where it was unlikely to be reviewed by a medical professional until the next day. Although plaintiff received medical attention on the night of his admission due to the fortunate intervention of one of the guards, Strom's failure to notify Noll immediately of his condition resulted in a delay of up to two hours. This delay may have contributed substantially to the extent of plaintiff's injuries since, according to plaintiff's expert, rapid re-warming may have prevented the need for some or all of plaintiff's amputations, while the efficacy of this potential treatment diminished the longer that passive re-warming was allowed to occur.

Defendants point out that under the subjective standard articulated in *Farmer*, no Eighth Amendment claim arises when a government official is unaware of the risk of harm to a prisoner, even if the risk is an obvious one. *See* 511 U.S. at 826, 114 S.Ct. 1970. *Farmer* also held, however, that "[w]hether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious." *Id.* Although plaintiff has offered no direct evidence demonstrating that Strom knew he would suffer severe injuries if she did not obtain immediate medical assistance, the Court finds that a reasonable jury could infer such knowledge based on the disclosures plaintiff made to her and the obvious need for attention in light of those disclosures. For these reasons, plaintiff's section 1983 claim against Strom should proceed in order to permit a jury to determine whether she possessed the requisite state of mind.

## C. Qualified Immunity

■■■ Defendants argue that even if Strom's actions deprived plaintiff of his rights under the Eighth and Fourteenth Amendments, his claims against her must be dismissed under the doctrine of qualified immunity. Under this doctrine, public officials are immune from suit under section 1983 for public conduct unless that conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *In order to evaluate whether a public official is entitled to qualified immunity, courts must consider:*

(1) whether the plaintiffs have asserted a violation of a constitutional or statutory right; (2) if so, whether the right was clearly established at the time of the violation; and (3) whether, given the facts most favorable to the plaintiffs, there are no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated that right.

*Burnham v. Ianni*, 119 F.3d 668, 673–74 (8th Cir.1997).

■■■ A public official asserting the qualified immunity defense bears the burden of demonstrating that the asserted constitutional or statutory right was not

clearly established. *See Buckley v. Rogerson,* 133 F.3d 1125, 1129 (8th Cir.1998). Moreover, courts in this circuit take a "broad view" of what constitutes a clearly established right. *Id.* The precise action or omission at issue need not have been declared unlawful for the right allegedly violated to be deemed clearly established. *See id.* (citing *Norfleet v. Arkansas Dep't of Human Svcs.,* 989 F.2d 289, 291 (8th Cir.1993)). Nevertheless, the Eighth Circuit emphasizes that the qualified immunity inquiry does not end with an abstract determination of whether the alleged right was clearly established. *See Reece v. Groose,* 60 F.3d 487, 491 (8th Cir.1995). Rather, courts should evaluate whether the right "could have been violated given the information available to the defendants at the time." *Id.*

█ For the above reasons, the Court finds that plaintiff has asserted a cognizable claim against Strom for violation of his rights under either the Eighth Amendment or the Due Process Clause. Defendants nevertheless argue that in failing to contact a nurse or a doctor immediately, Strom did not violate a clearly established constitutional right about which she reasonably could have known under the circumstances.

In *Estelle v. Gamble,* the Supreme Court recognized that a cause of action against a prison official may arise under the Eighth Amendment when the official delays a prisoner's access to needed medical care. *See* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs *or by prison guards in intentionally denying or delaying access to medical care* or intentionally interfering with the treatment once prescribed." (internal citations omitted) (emphasis added)). Thus, a prisoner's

right to prompt medical attention was, in the abstract, clearly established at the time .of plaintiff's admission to the Anoka County Jail.

Moreover, plaintiff has offered sufficient evidence to raise a fact issue regarding whether Strom knew that he faced a substantial risk of serious harm given the information that was available to her. Defendants point out that Strom is not. a medical doctor and could not be expected to know precisely the extent to which a delay in treatment might injure plaintiff. Nevertheless, plaintiff specifically asked to see a nurse or a doctor, and Strom ignored his request. Although a prison guard need not respond to such requests immediately in every case, plaintiff provided Strom with further information from which she could have determined that an immediate medical examination was genuinely necessary. Plaintiff specifically told Strom that he walked outside for hours before he turned himself in, and that he could no longer feel most of his toes. Moreover, Strom knew that this lack of feeling persisted despite the fact that plaintiff had been in the custody of the Marshals for several hours. Under these circumstances, the need for an immediate medical examination, or at least some form of further investigation into plaintiff's condition, was obvious. Nevertheless, Strom failed to contact the nurse on duty, and did not even take the minimal step of examining plaintiff's feet herself in order to assess whether a nurse should be notified. Based on this evidence, the Court finds that a reasonable factfinder could conclude that Strom disregarded a risk of harm to plaintiff about which she was aware. Thus, Strom has not demonstrated that, as a matter of law, a reasonable official would not have known that a failure to provide prompt medical attention would violate plaintiff's Eighth and Fourteenth Amendment rights. Strom's qualified immunity defense fails for these reasons.

#### D. Anoka County

Defendants argue that the Court should dismiss plaintiff's claims against Anoka County on the ground that he failed to properly plead them. Defendants specifically assert that plaintiff's complaint premises liability against Anoka County on the mere fact that it employs the individual defendants, and that plaintiff fails to allege that his injuries resulted from a government custom or policy. Under well-established law, a government entity is liable under section 1983 for the unconstitutional conduct of its officials only if the claimant demonstrates that such conduct resulted from a government custom or policy, see *Monell v. New York City Dep't of Social Servcs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), from a failure to provide adequate training, see *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), or from the final act of a government policymaking official, see *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

Upon reviewing plaintiff's complaint, the Court finds defendants' argument to be unpersuasive. Defendants correctly note that plaintiff failed to allege explicitly that his injuries resulted from a "custom or policy" pursuant to which Anoka County deprived prisoners of adequate medical care, or to allege in so many words that Anoka failed provide its officials with adequate training. Nevertheless, plaintiff expressly charged Anoka County with violating his constitutional rights, thus putting Anoka County on notice of his intent to prove government liability.

More importantly, plaintiff's complaint asserts specific facts from which a reasonable juror could infer that Anoka County officials had a custom or practice of providing inadequate medical care to prisoners at the jail. In addition to plaintiff's assertions with regard to Strom's conduct, the complaint also asserts that he specifically requested medical attention from another guard and that, like Strom, the guard ignored this request without investigating plaintiff's condition, notifying the nurse, or notifying his supervisor. Taken together, Strom's failure to notify the nurse about plaintiff's condition and the guard's subsequent failure to do so suggest that Anoka County officials have a practice of responding to prisoners' requests for medical attention by assuming, without consulting with a nurse or physician, that no immediate medical attention is necessary.

Moreover, the complaint alleges that Anoka County failed to follow the instructions of the physician who later examined him, stating, "The defendant Anoka County, did not follow the instructions of [the doctor] in that no steps were taken to protect and elevate the feet, and no steps were taken to prevent infection other than antibiotics prescribed by the doctor." The complaint specifically alleges that plaintiff had to treat his own injuries, soak his own feet, debride his own wounds, and administer his own medical injections with little assistance from staff at the jail. The complaint further alleges that, "[n]o effort was made to actively monitor the patient's treatment, nor was any effort made to keep the plaintiff off of his feet." Importantly, plaintiff's medical expert avers that the treatments plaintiff was forced to perform himself should have been administered by trained medical professionals, and that had plaintiff received proper care some of the tissue loss he experienced more likely than not could have been prevented.

Plaintiff's complaint thus alleges that several Anoka County officials neglected to provide him with adequate medical care on multiple occasions. Although the complaint does not specifically state that Anoka County had a "custom or policy" of providing inadequate care, these allegations support a reasonable inference that its officials had a practice of doing so, and that this practice was sufficiently widespread as to be attributable to Anoka

County. *See Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir.1998) (holding that a custom "not formally approved by an authorized decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law") (internal quotations omitted).

Defendants argue that under *Springdale*, 133 F.3d at 651–652, a section 1983 complaint against a government entity that fails to use the words "custom or policy" is necessarily insufficient to state a claim. Upon close examination, *Springdale* does not support defendants' position. Rather, *Springdale* emphasizes that "a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations." *Id.* at 651. *Springdale* thus requires courts to examine the supporting facts alleged in a plaintiff's complaint, but does not mandate dismissal based on the plaintiff's failure to use any particular phraseology in stating his or her claims. The court in that case accordingly looked to the particular facts alleged in the complaint to determine whether grounds for municipal liability were sufficiently plead. *See id.* at 651 ("[N]either the union's complaint nor amended complaint ... alleges that any constitutional injury was the result of an official policy or widespread custom of the school district. Instead, every alleged action is attributed specifically to Rollins, or to unnamed persons 'under his direction or control.' "). Unlike the complaint at issue in *Springdale*, plaintiff's complaint alleges a series of failures to attend to his medical needs attributable to several different Anoka County officials on multiple occasions, and continuing over a period of several weeks. For these reasons, the Court finds that plaintiff's complaint adequately pleads that Anoka County officials had a widespread custom of failing to provide care for his serious medical needs, even though the words "custom" or "policy" do not appear in the complaint. Defendants' motion to dismiss plaintiff's claim against

Anoka County on the ground that he improperly plead it is therefore denied.

## III. Common Law Claims

### A. Supplemental Jurisdiction

Defendants assert under *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), that, if the Court dismisses plaintiff's constitutional claims, such dismissal will deprive it of jurisdiction to consider plaintiff's remaining state law claims. This argument fails, given the Court's decision to permit some of plaintiff's constitutional claims to proceed. Moreover, *Finley* is inapposite to the facts of this case. In *Finley*, the Supreme Court held that a federal court could not exercise pendent party jurisdiction over additional parties as to which no independent basis for federal jurisdiction existed. *See id.* at 556, 109 S.Ct. 2003. Here, plaintiff asserts his state law claims only against parties whom he also charges with violations of federal law. Plaintiff's federal claims give rise to original jurisdiction over these defendants.

Furthermore, Congress legislatively overruled *Finley* in 1990 by enacting the Judicial Improvements Act of 1990, Pub.L. No. 101–650, § 310, 104 Stat. 5089, 5113–14 (1990) (codified at 28 U.S.C. § 1367). *See Kaiser v. Memorial Blood Ctr. of Minneapolis, Inc.*, 977 F.2d 1280, 1283 n. 1 (8th Cir.1992). 28 U.S.C. § 1367 provides, *inter alia*, that a district court has the discretion to either decline or retain jurisdiction over supplemental state law claims if it has dismissed all of the federal claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Given the extent to which the parties have already expended significant resources in litigating this matter, the Court would exercise its discretion to retain supplemental jurisdiction over plaintiff's state law claims in any event. Defendants' motion to dismiss plaintiff's state law claims on jurisdictional grounds is therefore denied.

**1070**

## B. Statutory Immunity

 Defendants also seek dismissal of plaintiff's common law claims against Anoka County, Strom and Noll on the ground that these claims are barred under section 466.03 of the state municipal tort liability statute, Minn.Stat. §§ 466.01–466.15. This statute provides generally that municipalities are subject to tort liability for the official acts of their employees and agents. *See* Minn.Stat. § 466.02. Section 466.03 enumerates several exceptions to this general rule, however, including an exception for "[a]ny claim for a loss based on the usual care and treatment, or lack of care and treatment, of any person at a municipal hospital or corrections facility where reasonable use of available funds has been made to provide care." Minn.Stat. § 466.03, subd. 11.

Although neither party has raised the issue, the Court questions whether this provision provides immunity to public officials, such as Strom and Noll, from tort claims raised against them in their personal capacities. The statute makes no mention of individual liability, and thus, a plain reading of the text suggests that immunity only inures to the benefit of the municipality involved. *See* Minn.Stat. § 433.03 ("As to any [enumerated] claim every municipality shall be liable only in accordance with the applicable statute and where there is no such statute, *every municipality* shall be immune from liability.") (emphasis added). Minnesota law provides an exception to liability against the state that is nearly identical to the provision under which defendants claim municipal immunity. *See* Minn.Stat. § 3.736, subd. 3(k). Unlike the municipal tort immunity statute, however, Minnesota's state tort immunity statute explicitly provides an exception to liability against public officials. *See* Minn.Stat. § 3.736, subd. 3 (providing that "the state *and its employees* are not liable" for enumerated losses) (emphasis added). The legislature's omission of similar language from the municipal tort immunity statute suggests an intent to provide the immunities set forth therein only to the government entities involved, and to cause public officials to rely instead on other defenses such as the common law doctrine of official immunity.

Nonetheless, the Court need not resolve this issue with finality, as the exception to municipal liability upon which defendants rely is otherwise inapplicable. The Court specifically finds that defendants have failed to demonstrate that Anoka County made a "reasonable use of available funds" to provide plaintiff with necessary medical care. Minn.Stat. § 466.03, sub. 11. Although no reported cases interpreting the statutory provision at issue appear to exist, in *Diedrich v. State*, 393 N.W.2d 677, 682–83 (Minn.Ct.App.1986), the Minnesota Court of Appeals interpreted the parallel provision for state immunity against claims based on lack of proper care in a state corrections facility. *See* Minn.Stat. § 3.736, subd. 3(k). Allowing the plaintiff's claim to proceed, the court held that the district court erred in rejecting his argument that the statutory language created an issue as to whether state officials had made reasonable use of their resources. *See Diedrich*, 393 N.W.2d at 682; *see also id.* at 683 ("We ... agree with Diedrich that the inclusion of the 'reasonable use' language seems to allow the possibility of a suit based on 'usual care or treatment,' given the proper facts."). Thus, the statutory language, and the only state court case interpreting it, suggests that the immunity provision applies only when a government entity has shown that it made a reasonable use of available funds in providing the plaintiff with care.

In the case at bar, defendants have made only a very weak attempt to demonstrate that they reasonably used available funds in providing care to plaintiff. They assert that Anoka County expended $235,957.24 on medical care for inmates at the jail in 1996, and that Anoka County's total expenditures for the jail in 1996 were $4,033,798. These figures are relatively meaningless, however, since defendants of-

fer no evidence pertaining to the medical expenditures actually made in plaintiff's case, the amount of funds for inmate medical care remaining in Anoka County's budget at the time of plaintiff's treatment, or the approximate number of inmates who might be expected to need medical care in the future.

Defendants further contend that Anoka County made "reasonable use" of its available funds by providing plaintiff with regular nursing and physician care, with regular medications, and with hospital care during his amputations. Nevertheless, defendants' showing that Anoka County provided plaintiff with some care does not lead to a conclusion that its use of available funds was reasonable. Plaintiff has offered evidence indicating that he was denied immediate medical attention on the night of his admission to the jail, and that Anoka County thereafter failed to provide him with continuous nursing care such that he regularly had to administer his own I.V. medications and treat his own wounds. Although it is possible that Anoka County simply did not have funds available to provide plaintiff with more complete care, it has submitted no specific information from which the Court might draw such a conclusion. A fact issue thus remains as to whether Anoka County made reasonable use of available funds to provide care to plaintiff. Defendants' motion to dismiss plaintiff's state law claims on the ground of immunity under the municipal tort claims statute, Minn.Stat. § 466.03, subd. 11, is denied for these reasons.[7]

7. In so holding, the Court expresses no opinion as to whether defendants are immune from liability on a ground that they have not asserted, such as the doctrines of discretionary or official immunity. Moreover, having rejected defendants' affirmative defense under Minn.Stat. § 466.03, subd. 11 on the merits, the Court does not address plaintiff's contention that they waived it by failing to properly assert it in their answer.